IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (CINCINNATI)

| | | |
|---|---|---|
| NOTICXE, INC.<br>(f/k/a EXCITON, INC.)<br>5271 SPLIT RAIL<br>DAYTON, OHIO 45429-1962 | : <br> : <br> : <br> : <br> : | Case No. 18-cv-133 <br><br> Judge _____ |
|      Plaintiff, | : <br> : | |
| vs. | : <br> : | |
| OAKLEY, INC.<br>1 ICON<br>FOOTHILL RANCH, CALIFORNIA 92610<br>c/o<br>NATIONAL REGISTERED AGENTS, INC.<br>4400 EASTON COMMONS WAY STE. 125<br>COLUMBUS, OHIO 43219 | : <br> : <br> : <br> : <br> : <br> : | **COMPLAINT FOR<br>DECLARATORY JUDGMENT,<br>BREACH OF CONTRACT,<br>MISAPPROPRIATION OF TRADE<br>SECRETS, AND TORTIOUS<br>INTERFERENCE**<br><br>**DEMAND FOR JURY TRIAL** |
|      Defendant. | | |

Plaintiff Noticxe, Inc., formerly known as Exciton, Inc. ("Plaintiff" or "Exciton"), for its Complaint against Defendant Oakley, Inc. ("Defendant" or "Oakley") (individually "Party" and collectively "Parties") states and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff is an Ohio corporation with its principal place of business at 5271 Split Rail, Dayton, Ohio 45429-1962. On January 30, 2017, Exciton amended its Articles of Incorporation and changed its name to Noticxe, Inc.

2.     Defendant Oakley is a Washington corporation with its principal place of business at 1 Icon, Foothill Ranch, California 92610.

3.      This Court has diversity jurisdiction of this action pursuant to 28 U.S.C. §1332(a) in that there is a complete diversity of citizenship between the Parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  The Parties entered into an Asset Purchase Agreement, as amended and assigned, in which the Parties agreed that this Court is the appropriate venue.

## BACKGROUND FACTS

5.      Plaintiff is a researcher, developer, creator, manufacturer, and distributor of various chemical dyes and compounds used in connection with lasers and other applications. Plaintiff competes with other research and development facilities, manufacturers, and distributors throughout the United States, Europe, Canada, Japan, Mexico, and Southeast Asia.  Plaintiff was founded by Richard N. Steppel, Ph.D. in 1974.  Dr. Steppel is a professional chemist who has a Ph.D. in organic chemistry.

6.      Upon information and belief, Defendant is a sports equipment company that designs, develops, manufacturers, and sells sports performance equipment and lifestyle pieces, including eyewear.

7.      On or about July 22, 2016, Plaintiff entered into an Asset Purchase Agreement ("Agreement") with Eye Safety Systems, Inc., a Delaware Corporation, which resulted in the sale of most, but not all, of Plaintiff's business.  Pursuant to the terms of the Agreement, Ohio law governs.

8.     On or about November 8, 2016, Eye Safety Systems, Inc. assigned all of its rights and obligations under the Agreement to Defendant Oakley.

9.     On or about November 9, 2016, Plaintiff and Defendant amended the Agreement to extend the closing date from October 31, 2016 to January 27, 2017.

10.    On or about January 27, 2017, the Parties entered into an Assignment and Assumption Agreement, which memorialized the assignment of the Agreement to Defendant. Nothing in the Assignment and Assumption Agreement modifies any of the provisions of the Agreement; the Assignment and Assumption Agreement is only an instrument of transfer and conveyance.

11.    On or about January 27, 2017, the Parties entered into an Escrow Agreement, which required Defendant to deposit $1,300,000 with an escrow agent for the purpose of securing certain obligations of Plaintiff under the Agreement.  Unless a proper claim notice is made by Defendant to Plaintiff and the escrow agent, and remains unresolved as of January 27, 2018 (one year from the closing date of the Agreement), the $1,300,000 must be transferred to Plaintiff.  As of the date of this filing, none of the escrow funds have been transferred to Plaintiff.

### DEVELOPMENT OF TRADE SECRETS EXCLUDED FROM AGREEMENT

12.    Under the terms of the Agreement, Plaintiff sold certain specified assets of its business to Defendant.  The Agreement provides that Defendant would purchase Plaintiff's commercial business only.

3

13.     Plaintiff also did business, directly and indirectly, with the U.S. Department of Defense ("Military Business").  The Military Business included certain proprietary and confidential technologies, including organic chemical processes relating to laser dyes AF-G1 (Green-1) and ABS 530, which are used only in military applications ("Confidential Technology").  Specifically, the Confidential Technology includes processes used to develop large amounts of Green-1 and ABS 530.  Plaintiff began developing the Confidential Technology in approximately 2007.  Over the course of the past decade, Plaintiff invested a significant amount of time (over 8,000 man-hours) and financial resources (over $1 million) into developing the Confidential Technology.  The Confidential Technology is used primarily by the U.S. Air Force.  There is no commercial application or market for the Confidential Technology.  The Confidential Technology is subject to International Traffic and Arms Regulations ("ITAR"), among other federal secrecy restrictions.

14.     Under the terms of the Agreement, the Military Business and the Confidential Technology associated with it were not sold to Defendant.  Plaintiff retained all rights and obligations associated with the Military Business and Confidential Technology.

15.     In late-April 2016 and early-July 2016, prior to the execution of the Agreement, counsel for the Parties, respectively, discussed the Confidential Technology and Military Business.  In those discussions, counsel for Defendant confirmed that Defendant was not interested in purchasing any of the technology associated with the Military Business, including the Confidential Technology, and that those assets should be excluded from the terms of the Agreement.

16.     Pursuant to the terms of the Agreement, the Ohio Uniform Trade Secrets Act, and Ohio common law, the Confidential Technology associated with the Military Business is a trade secret of Plaintiff.  Article 1 of the Agreement defines "Intellectual Property" to include ". . . confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, notes, binders, compositions and other trade secrets, whether or not patentable . . . ."

17.     Under the terms of the Agreement, certain assets of Plaintiff were explicitly excluded from the sale to Defendant.  In Section 2.01 of the Agreement, Plaintiff agreed to sell its Intellectual Property Assets, "except for Excluded IP Assets" defined by the Agreement.

18.     Among the Excluded IP Assets in Section 2.02 of the Agreement are the following:

> "(k)  [A]ny and all right, title and interest in and to any intellectual property asset of any nature, including, but not limited to, rights to use, processes utilized to develop and/or produce such assets, belonging to, or otherwise owned by any Governmental Authority, as set forth in Section 2.02(k) of the Disclosure Schedules (the **"Excluded IP Assets"**)."

19.     Schedule 2.02(k) of the Disclosure Schedules identifies the "Excluded IP Assets." The Excluded IP Assets include, among other assets to which Plaintiff expressly retains all rights even if not specifically included and/or identified in this Complaint, Green-1 and ABS 530:

> "(a)  . . . one patent application (US # 10769508) . . . .
>
> *        *        *
>
> (d)  Laser Eye Protection SBIR, Green1 and IR Dyes, government contracted materials and related research intermediates, along with the proprietary processes and procedures utilized to develop such assets with government funds."

20.     The patent application (US # 10769508) referenced in Schedule 2.02(k), (a), which relates to Green-1, is subject to a secrecy order that was issued by the U.S. Patent and Trademark Office pursuant to the Invention Secrecy Act of 1951, 35 U.S.C. § 181 – 188, on the recommendation of the U.S. Air Force.  Pursuant to that secrecy order, the subject matter of that patent application has not been published or otherwise publicly disclosed.  Although ABS 530 is not specifically identified in Schedule 2.02(k), (d), it is included among the "government contracted materials and related research intermediaries, along with the proprietary processes and procedures utilized to develop such assets with government funds" expressly excluded from the Agreement.

21.     The Confidential Technology was developed by Plaintiff's owner, Dr. Steppel, and Paul Cahill, a senior executive of Plaintiff, years before the Parties started negotiating a potential asset purchase agreement.  To protect the development of the Confidential Technology (and other technologies and products), Dr. Cahill signed an Employment Agreement with Plaintiff.

22.     Under the terms of Dr. Cahill's Employment Agreement with Plaintiff, Dr. Cahill agreed to the following provisions relevant to the allegations in this Complaint:

> •"8.  Use of Confidential Information.  If Cahill makes an Invention, originates a Work of Authorship, or creates Confidential Information it shall without further payment immediately become the property of Exciton; and further, Cahill shall:
>
>         *   *   *
>
> (b) Execute . . . documents relating to each Invention and Work of Authorship necessary or proper to vest ownership in Exciton and obtain, maintain and enforce . . . proprietary rights to the Inventions and Works of Authorship throughout the world;

(c) Give affidavits and testimony as to facts within Cahill's knowledge in connection with any such Inventions and Works of Authorship in any administrative proceedings, arbitration, litigation or controversy relating thereto; and

(d) Make and maintain adequate and current written records of any Inventions Cahill conceives or Works of Authorship Cahill originates, in the form of notes, sketches, drawings, or reports relating thereto, which records shall be and remain the property of and available to Exciton at all times, and upon termination of Cahill's employment, Cahill agrees to deliver such records to Exciton. Cahill further agrees to prepare such records at the request of Exciton to the extent such records do not exits upon termination of Cahill's employment."

•"9. <u>Nondisclosure.</u> " Upon termination of Dr. Cahill's employment with Plaintiff, he "will never, either during his employment by Exciton, or thereafter, use or disclose any Confidential Information. Upon termination of Cahill's employment by Exciton, all things and documents containing Confidential Information including copies thereof in his possession, whether made by him or others, will be left with Exciton. This provision shall continue to bind Cahill during his employment by Exciton and after termination thereof only so long as such information remains Confidential Information."

•"10. <u>Duty of Loyalty</u>. . . . [D]uring [Cahill's] employment by Exciton and thereafter, he will not become involved in any situation in which the loyalty fulfillment of his duties and responsibilities in that situation would inherently call upon him to reveal or to use Confidential Information."

•"11. <u>Noncompetition</u>. (a) . . . Cahill covenants that, during his employment and for a period of two years immediately following the termination of his employment by Exciton, he will not . . . engage in the promotion or sale of any product, process or service which competes with any of those: (i) which he has promoted or sold or been associated with during any part of the five years immediately preceding the termination of his employment with Exciton; or (ii) about which he has acquired or created Confidential Information.

(b) . . . Cahill covenants that, during his employment and for a period of two years immediately following the termination of his employment with Exciton, he will not . . . become engaged in any technical, promotional or supervisory capacity relating to any similar produce, process or service which competes with the

> products, process or services: (i) upon which he has worked or
> been associated with during any part of the five years immediately
> preceding the termination of his employment by Exciton; or (ii)
> about which he has acquired or created Confidential Information
>
> (c) . . . [Cahill] will not . . . render services similar to those he
> rendered to Exciton on behalf of any person, including himself, or
> a business unit of any organization who or which is engaged in or
> is to become engaged in, research, development, engineering,
> manufacture, evaluation, testing, installation, marketing, selling or
> servicing a similar product or service which competes with a
> product, process or service of Exciton."

23.     As part of the terms of the Agreement (as amended and assigned), Dr. Cahill

became an employee of Defendant; the relevant restrictions in his Employment Agreement with

Plaintiff continued to apply post-termination.

24.     The only other individuals with knowledge of Plaintiff's Confidential Technology

are four chemists who worked for Plaintiff prior to the closing of the Agreement, Kenneth

Honeyman, Timothy Pollagi, Derek Fischer, and Patrick Himmelberg, and are now employees of

Defendant pursuant to the Agreement. Messrs. Honeyman, Pollagi, Fischer, and Himmelberg

each signed a nondisclosure/confidentiality agreement with Plaintiff, which protects, among

other confidential and proprietary information, the Confidential Technology.

25.     Plaintiff's former office manager, Carrie Brown, was not involved in the

development of the Confidential Technology; however, she executed an affidavit following the

closing of the Agreement in which she agreed not to take with her or disclose any information or

technology excluded from the Agreement. Pursuant to the terms of the Agreement, Ms. Brown

is an employee of Defendant.

26.     In addition to the protections contained in the Agreement (as amended and

assigned), Dr. Cahill's Employment Agreement, and the nondisclosure/confidentiality

agreements executed by each of Plaintiff's employees, the Confidential Technology was protected by ITAR (International Traffic and Arms Regulations) and confidentiality/nondisclosure agreements with the federal government.

27.     ITAR prohibits certain materials from being disclosed to certain foreign countries. Plaintiff has taken steps to be ITAR compliant in its use of the Confidential Technology.  To the best of its knowledge, Defendant, which is owned by an Italian company, is not ITAR compliant.

28.     Furthermore, Plaintiff's patent application (US # 10769508), which relates to Green-1, is subject to a secrecy order that was issued by the U.S. Patent and Trademark Office pursuant to the Invention Secrecy Act of 1951, 35 U.S.C. § 181 – 188, on the recommendation of the U.S. Air Force.

29.     In addition to sharing the Confidential Technology on a need-to-know basis, executing nondisclosure/confidentiality agreements with employees, contractors, service providers, customers, and the federal government, Plaintiff protected the Confidential Technology from unauthorized disclosure and dissemination by keeping all laboratory notebooks and other written materials that may include the Confidential Technology in Plaintiff's offices, which were accessible only to Plaintiff's employees or other authorized personnel, locked each night, and under 24-hour surveillance video.  Plaintiff also required its customers to execute agreements not to reverse-engineer certain of its sensitive and proprietary products, including the Confidential Technology.

30.     As a result of the exclusion of the Military Business and Confidential Technology from the Agreement, prior to the closing, Plaintiff redacted information relating to the Confidential Technology from materials transferred to Defendant as part of the Agreement,

including laboratory notebooks, reports, and other materials.  These redactions included electronic documents and were necessary to make sure the Confidential Technology was not disclosed as part of the sale to Defendant.

<b><u>PLAINTIFF'S USE OF THE CONFIDENTIAL TECHNOLOGY</u></b>

31.     The market for the Confidential Technology is extremely limited.  Since it has no commercial application or use, the U.S. Air Force, either directly or via one of a few government contractors domestically, is the only end-user of the Confidential Technology.  Therefore, the Confidential Technology derives independent economic value from not being generally known.

32.     Among those government contractors interested in the Confidential Technology are Teledyne Scientific & Imaging, LLC ("Teledyne") and Gentex Corporation ("Gentex"). Teledyne is based out of California and works in the aerospace and defense industries, among others.  Gentex is based out of Pennsylvania and also works in the aerospace and defense industries.

33.     Nearly a decade before Plaintiff began negotiating the sale of its business to Defendant, Plaintiff entered into a business relationship with Teledyne relating to the Confidential Technology.  Plaintiff and Teledyne had a standing purchase order for Green-1, among other dyes.  Teledyne executed a nondisclosure agreement with Plaintiff relating to the Confidential Technology.

34.     On or about October 2016, after Defendant declined to purchase the Confidential Technology as part of the Agreement, Plaintiff, by and through Drs. Cahill and Steppel, began discussions with the U.S. Air Force and certain government contractors, including Teledyne and

Gentex, regarding the purchase of the Confidential Technology. Dr. Cahill continued to participate in these negotiations and discussions on behalf of Plaintiff until the closing date of the Agreement, at which time Dr. Cahill became an employee of Defendant and was contractually prohibited from using the Confidential Technology.

35.     Dr. Cahill knew that he could not use or discuss the Confidential Technology following the closing date of the Agreement. For example, after the close of the Agreement, Dr. Cahill sent an email to Dr. Steppel, forwarding communications from the U.S. Air Force regarding the potential sale of the Confidential Technology, and advising Dr. Steppel that he can no longer participate in these conversations unless Dr. Steppel asks him to participate. Following the closing of the Agreement, Dr. Steppel (or anyone acting on his or Plaintiff's behalf) never asked Dr. Cahill to participate in any communications with any third party, including the U.S. Air Force, Teledyne, and Gentex, regarding the Confidential Technology.

36.     In February 2017, the U.S. Air Force sent to Plaintiff a request for proposal for the sale of the Confidential Technology. As part of the ongoing negotiations with the U.S. Air Force, a third party appraised the Confidential Technology for Plaintiff. The third party appraised the Confidential Technology as having a value in excess of one million dollars. On or about June 2017, Plaintiff shared this appraisal with the U.S. Air Force.

37.     In the spring or summer of 2017, upon information and belief, Dr. Cahill, acting on behalf of Defendant, informed the U.S. Air Force that Defendant owns the Confidential Technology and offered to sell the Confidential Technology to the U.S. Air Force. The conflicting information provided by Defendant to the U.S. Air Force about the ownership of the Confidential Technology caused the U.S. Air Force to cease negotiations with Plaintiff.

38.     Dr. Steppel also had discussions with Teledyne and Gentex regarding the sale of the Confidential Technology.  As part of these negotiations, upon information and belief, Teledyne contacted a potential manufacturer of the Confidential Technology, TDA Research Inc. ("TDA").  If the sale were to be completed, then Teledyne would need a company like TDA to manufacture the Green-1.  Teledyne asked TDA to execute a nondisclosure agreement relating to the Confidential Technology; however, TDA declined to execute the nondisclosure agreement because of a conflict of interest.  Upon information and belief, the conflict of interest arose as a result of Defendant indicating that it owned the Confidential Technology and could provide it to the U.S. Air Force, which contacted TDA to manufacture the Confidential Technology for it.

39.     Teledyne subsequently informed Plaintiff that another company may be capable of manufacturing the Confidential Technology, and the negotiations between Plaintiff and Teledyne continued.  Notwithstanding the continuing negotiations with Teledyne, upon information and belief, Defendant, by and through Dr. Cahill, continues as of the date of filing this Complaint to contact Teledyne and other third parties to offer Defendant's assistance with the development of the Confidential Technology.

40.     At all relevant times, Defendant, by and through Dr. Cahill, knew or had reason to know that Plaintiff retained all rights to the Military Business, including the Confidential Technology, following the close of the Agreement, and knew or had reason to know that Plaintiff was negotiating the sale of the Confidential Technology to the U.S. Air Force, Teledyne, Gentex, and/or one of the few government other contractors to which the Confidential Technology could be marketed and sold.

41.     Upon information and belief, Defendant, through its agents, employees, or affiliated entities, has contacted third parties, including those identified in this Complaint, and represented to them that it owns the Confidential Technology related to Plaintiff's Military Business and that it can purchase, license, and/or resell the Confidential Technology to third parties.  Plaintiff's negotiations with these third parties, including those specifically identified in this Complaint, have been stifled, stalled, or otherwise hampered because of Defendant's improper actions relating to the Confidential Technology.

## FIRST CLAIM FOR RELIEF (DECLARATORY JUDGMENT)

42.     Plaintiff repeats the allegations contained in Paragraphs 1 to 41 of this Complaint as if fully set forth here.

43.     Actual, continuing, and substantial controversies exist between Plaintiff and Defendant regarding the ownership of the Military Business, including the Confidential Technology.

44.     Plaintiff has a direct and substantial interest in the resolution of these controversies regarding its rights and the obligations of the Parties under the terms of the Agreement, as amended and assigned, and the Escrow Agreement.  Pursuant to 28 U.S.C. §2201 and Ohio Revised Code Chapter 2721, Plaintiff is entitled to a judgment declaring that: (a) Plaintiff is the sole and exclusive owner of the Military Business, including the Confidential Technology; (b) the Confidential Technology is a trade secret; (c) Plaintiff is permitted to retain a copy of all materials, however maintained and in whatever form, containing information relating to the sale of assets to Defendant, including laboratory notebooks, reports, and other materials; (d) Plaintiff is permitted to retain copies of all materials, however maintained and in

13

whatever form, containing information relating to the Military Business, including the Confidential Technology, and is permitted to redact information relating to the Military Business, including the Confidential Technology, from materials transferred to Defendant as part of the Agreement, including laboratory notebooks, reports, and other materials; (e) Defendant is obligated under the terms of the Agreement, as amended and assigned, to maintain the confidentiality of the Confidential Technology, and refrain from marketing, licensing, and/or selling any of the Confidential Technology; and (f) Defendant is required to compensate Plaintiff for Defendant's improper actions and misuse of the Confidential Technology as alleged in this Complaint, including but not limited to a full and complete transfer of the $1,300,000 escrow funds to Plaintiff.

## SECOND CLAIM FOR RELIEF (BREACH OF CONTRACT)

45.    Plaintiff repeats the allegations contained in Paragraphs 1 to 44 of this Complaint as if fully set forth here.

46.    Under the terms of the Agreement, certain intellectual property, including the Confidential Technology, was excluded from the transaction, and that Confidential Technology is exclusively owned and possessed by Plaintiff.

47.    Defendant's conduct, including the use of the Confidential Technology, the representations to third parties that it owns and possesses the Confidential Technology, and that it can sell or license the Confidential Technology, constitutes a material breach of the Agreement.

14

48. Plaintiff has performed all of the conditions on its part to be performed under the terms of the Agreement.

49. As a direct and proximate result of Defendant's breach of the Agreement, Plaintiff has been damaged in an amount exceeding $75,000.

## THIRD CLAIM FOR RELIEF (BREACH OF CONTRACT)

50. Plaintiff repeats the allegations contained in Paragraphs 1 to 49 of this Complaint as if fully set forth here.

51. Under Section 6.18 of the Agreement, "Removal of Purchased Assets," Defendant was responsible for removing all assets purchased under the terms of the Agreement from Plaintiff's property within thirty (30) days of the closing date. If Defendant failed to remove the purchased assets, as defined in the Agreement, from Plaintiff's property, within thirty days, then Defendant is obligated to pay Plaintiff $50,000 per month until the purchased assets are removed ("Late Removal Fee").

52. Defendant failed to remove timely the purchased assets and incurred two months of the Late Removal Fee totaling $100,000. Defendant has failed to remit payment of any portion of the amounts due and owing under the terms of the Agreement.

53. Plaintiff has performed all of the conditions on its part to be performed under the terms of the Agreement. The failure of Defendant to remit payment of the Late Removal Fee constitutes a material breach of the Agreement.

54. As a direct and proximate result of Defendant's breach of the Agreement, Plaintiff has been damaged in an amount exceeding $75,000.

## FOURTH CLAIM FOR RELIEF (MISAPPROPRIATION OF TRADE SECRETS UNDER THE OHIO UNIFORM TRADE SECRETS ACT)

55. Plaintiff repeats the allegations contained in Paragraphs 1 to 54 of this Complaint as if fully set forth here.

56. Plaintiff's Confidential Technology derives independent economic value from not being generally known to, and not readily ascertainable by proper means by, another person who can obtain economic value from their disclosure or use. There is a limited market in which the Confidential Technology may be sold; and, to the best of Plaintiff's knowledge, Plaintiff is the only entity that has been able to develop the requisite processes to develop the Confidential Technology necessary to serve the needs in this market. If the Confidential Technology were to become public, it not only harms Plaintiff financially and otherwise, but the security of the U.S. Air Force as well.

57. Plaintiff incurred significant time, expense, and resources to develop the Confidential Technology over the last decade.

58. Plaintiff's Confidential Technology is, and at all relevant times was, the subject of reasonable efforts to maintain its secrecy. Plaintiff guards the confidentiality of these trade secrets by various means, including nondisclosure and confidentiality agreements with its employees, contractors, service providers, and customers, by affirmatively taking steps to maintain confidentiality under the terms of the Agreement, by limiting those with knowledge of

the Confidential Technology on a need-to-know basis, and securing Plaintiff's offices and laboratory space in which the Confidential Technology was developed and used.

59.     Defendant knew, or should have known, by and through Dr. Cahill and others, that the Confidential Technology acquired improperly from Plaintiff gave rise to a duty to maintain secrecy.  Defendant was contractually obligated to protect the Confidential Technology, which was excluded from the Agreement, and Plaintiff took affirmative steps to ensure its nondisclosure.  For example, Plaintiff redacted information relating to the Confidential Technology from materials provided to Defendant.

60.     Defendant has wrongfully taken, retained, maintained, used, and disclosed Plaintiff's Confidential Technology, including proprietary and trade secret information, including but not limited to by representing to third parties that it owns this technology and it is available for sale or license.

61.     The Ohio Uniform Trade Secrets Act ("Rev. Code §§1333.61-1333.69 ("Ohio Trade Secrets Statute")) prohibits the taking, use, or disclosure of trade secrets.  The Ohio Trade Secrets Statute, at §1333.61(B), defines "misappropriation" to include, among other things, disclosure or use of a trade secret of another without the express or implied consent of the other person, by a person who, at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

62.     Defendant knows that it is in the possession of Confidential Technology that was expressly excluded from the Agreement, and is owned exclusively by Plaintiff.

63.     Plaintiff never provided express or implied consent to Defendant to maintain, use, or disclose the information related to the Confidential Technology.  Therefore, the unlawful and improper actions of Defendant, as described in this Complaint, including Defendant's representations to third parties that it lawfully possesses this confidential information and it is available for sale, constitute misappropriation of Plaintiff's Confidential Technology, including proprietary and trade secret information, in violation of the Ohio Trade Secrets Statute.

64.     Defendant's misappropriation as alleged in this Complaint was, and continues to be, willful and malicious.  Because there is a limited market for the sale or license of the Confidential Technology to the Military Business, it is inevitable that Defendant will continue to misappropriate Plaintiff's trade secrets as it seeks to find a buyer.

65.     Pursuant to the Ohio Trade Secrets Statute and Ohio common law pertaining to the protection of confidential information, Plaintiff is entitled to recover damages in an amount to be determined at trial, including damages for business losses suffered by Plaintiff.

66.     Plaintiff is further entitled to injunctive relief against Defendant to prevent future misappropriation, and to an award against Defendant of Plaintiff's reasonable attorney's fees and punitive or exemplary damages, all pursuant to the Ohio Trade Secrets Statute §§1333.62-1333.64.

## FIFTH COUNT FOR RELIEF (TORTIOUS INTERFERENCE WITH CONTRACTS AND BUSINESS RELATIONSHIPS)

67.     Plaintiff repeats the allegations contained in Paragraphs 1 to 66 of this Complaint as if fully set forth here.

68.     At all relevant times, Plaintiff and the U.S. Air Force had a business relationship that included active negotiations for Plaintiff's Confidential Technology. Defendant, by and through Dr. Cahill, among others, was aware of the business relationship and negotiations between Plaintiff and the U.S. Air Force, when Defendant misused, disclosed, and attempted to sell, license, or otherwise use the Confidential Technology in violation of the Agreement.

69.     At all relevant times, Plaintiff and Teledyne had a business relationship that includes a standing purchase order and active negotiations for Plaintiff's Confidential Technology. Defendant, by and through Dr. Cahill, among others, was aware of the business relationship, standing purchase order, and negotiations between Plaintiff and Teledyne when Defendant misused, disclosed, and attempted to sell, license, or otherwise use the Confidential Technology in violation of the Agreement.

70.     Defendant intentionally interfered with Plaintiff's respective business relationships with the U.S. Air Force and Teledyne, among others, by improperly sharing trade secret information relating to Plaintiff's Confidential Technology and offering to sell, license, or otherwise assist with the development and/or manufacturing of the Confidential Technology.

71.     For example, as a result of Defendant's improper actions relating to the use and disclosure of Plaintiff's Confidential Technology, the U.S. Air Force, and/or its affiliates, ceased

negotiations and discussions with Plaintiff, and the negotiations with Teledyne stalled and were otherwise hampered.

72.     Defendant's tortious interference with Plaintiff's current business, contractual, and future business relationships with the U.S. Air Force, Teledyne, and other third parties, was intentional and in reckless disregard of the probable consequences, and without justification.

73.     As a result of Defendant's interference with Plaintiff's contractual and future business relationships with the entities alleged in this Complaint, Plaintiff has been damaged in an amount to be proven at trial, which exceeds $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.     Enter a permanent injunction preventing and prohibiting Defendant, its directors, officers, agents, servants, employees, affiliates, and attorneys, and all others in active concert or participation with them, from:

      1.     failing to comply with the Agreement; and

      2.     further misappropriating Plaintiff's Confidential Technology in violation of the Agreement, and the Ohio Trade Secrets Statute;

B.     Enter a permanent injunction enforcing the confidentiality and use obligations in the Agreement;

C.     Enter judgment in favor of Plaintiff for damages incurred as a result of Defendant's breaches of the Agreement;

D.     Enter judgment in favor of Plaintiff for damages incurred as a result of Defendant's tortious interference with Plaintiff's contractual and business relationship with the third parties with which Plaintiff has been negotiating the sale and/or licensing of its Confidential Technology;

E.     Enter judgment in favor of Plaintiff for its costs and attorneys' fees incurred in this action pursuant to the Ohio Trade Secrets Statute;

F.     Enter judgment in favor of Plaintiff for exemplary or punitive damages incurred in this action pursuant to the Ohio Trade Secrets Statute; and

G.     For such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

/s/ D. Jeffrey Ireland
D. Jeffrey Ireland (0010443)
    (Trial Attorney)
Erin E. Rhinehart (0078298)
Christopher C. Hollon (0086480)
FARUKI IRELAND COX
RHINEHART & DUSING PLL
110 North Main Street, Suite 1600
Dayton, OH  45402
Telephone:  (937) 227-3700
Telecopier:  (937) 227-3717
Emails:  djireland@ficlaw.com
          erhinehart@ficlaw.com
          chollon@ficlaw.com

Attorneys for Plaintiff, NOTICXE, INC.
(formerly known as Exciton, Inc.)

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims triable to a jury.

/s/ D. Jeffrey Ireland
D. Jeffrey Ireland

1250109.4